# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**In re Marriage of Kincaid, 2012 IL App (3d) 110511**

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF LYNNE P. KINCAID, Petitioner-Appellee, and BRIAN R. KINCAID, Respondent-Appellant. |
| District & No. | Third District<br>Docket No. 3-11-0511 |
| Filed | July 3, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The order increasing respondent's unallocated support obligation based on his gross income was remanded for consideration of his net income, because unallocated support is comprised of some child support and net income must always be determined before making such an award. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 07-D-547; the Hon. Robert J. Baron, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on Appeal | Edward R. Jaquays, Martin Rudman, and Mark Ellis, all of Law Offices of Edward R. Jaquays, of Joliet, for appellant.

Paul S. Braun, Lauren A. Dropkin, and Thomas C. Edwards, all of Braun & Edwards, Chtrd., of Flossmoor, for appellee.

Panel | JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justices Carter and McDade concurred in the judgment and opinion.

**OPINION**

¶ 1    Less than a year after a judgment for dissolution of marriage was entered, dissolving the marriage of Brian and Lynne Kincaid, Lynne filed a motion to vacate or modify the judgment. Thereafter, Lynne filed a petition for removal, seeking to remove her and Brian's children to Austin, Texas. Several months later, Lynne filed a petition for rule to show cause for indirect civil contempt against Brian for his failure to pay counseling expenses for the children. Following hearings, the trial court granted Lynne's motion to modify and increased Brian's unallocated family support from $5,500 per month to $9,800 per month based on Brian's gross income. The trial court also granted Lynne's petition for removal and ordered Brian to pay half of the children's counseling expenses. We affirm the trial court's orders granting Lynne's petition for removal and requiring Brian to pay half of the children's counseling bills. We reverse the trial court's order increasing Brian's unallocated support and remand for the trial court to determine Brian's net income before modifying the support award.

¶ 2    Brian and Lynne Kincaid were married in March 1995. They had two children: P.K. was born in 1995, and C.K. was born in 1997. In 2001, Brian and Lynne purchased a home in Frankfort, Illinois. In 2007, Lynne filed a petition for dissolution of marriage.

¶ 3    In September 2008, a judgment for dissolution of marriage was entered, dissolving the couple's marriage. Incorporated in the judgment were a marital settlement agreement and a joint parenting agreement. The marital settlement agreement required Brian to pay Lynne "unallocated family support" of $5,500 per month for 48 months, based on Brian's income of $125,000 per year. The agreement awarded the marital residence to Lynne. She was required to refinance the home within two years or, if unsuccessful, sell it. The marital settlement agreement also provided: "All health expenses of the children *** that are not paid by insurance shall be paid equally by BRIAN and LYNNE."

¶ 4    According to the joint parenting agreement, the parties shared joint custody of P.K. and C.K. Lynne was designated as the children's residential parent, and Brian was granted parenting time with the children every other weekend, one night each week, three weeks in the

summer, and alternating holidays. The joint parenting agreement further provided:

> "The parties agree to discuss all health, education, and religious training issues, prior to any major decision being made. *** After discussion and failure of the parties to reach accord on a major decision, the party seriously objecting to the plan of the other party shall be responsible for instituting mediation, and, if necessary, thereafter and as a last resort, Court proceedings."

¶ 5    In July 2009, Lynne discovered that Brian's income had increased substantially. As a result, she filed a motion seeking to have the dissolution judgment vacated or modified to increase Brian's support payments.

¶ 6    In July 2010, Lynne was offered a position with a company based in Austin, Texas. After Brian objected to Lynne moving to Austin with the children, Lynne filed a petition to remove the children to Austin.

¶ 7    In April 2011, Lynne filed a petition for rule to show cause for indirect civil contempt against Brian because he refused to pay counseling bills for the children. The bills were for counseling sessions the children attended with Jean Gray, a therapist.

¶ 8    Hearings on Lynne's motion and petitions were held in May and June 2011. At the hearings, Brian presented evidence showing that his gross income was $253,258 in 2009, and $294,729 in 2010. Lynne submitted an income/expense affidavit showing her monthly expenses to be $11,824.

¶ 9    At the hearing, Lynne testified that she is from Texas. She has no family in Illinois. She has approximately 50 family members in the Austin, Texas, area, including her mother and brother. She and the children visit Texas several times a year and have stayed there for up to a month at a time.

¶ 10    Lynne was a stay-at-home mother throughout her marriage to Brian. In 2007, she obtained employment with the Village of Frankfort. She was laid off from that job in 2009, but continued to perform projects for the village and other entities on a part-time basis. In 2010, she began taking projects from a marketing firm and worked approximately 100 hours per month. Her income in 2010 was $32,000.

¶ 11    In July 2010, Lynne received a job offer in Austin. She met with Brian to discuss the possibility of her and the children moving to Texas. Brian initially told her that he had no problem with the move. However, the day before Lynne and the children were scheduled to move, Brian told her that he would consent to the move only if she withdrew her motion to increase support. Lynne decided not to move and lost that job opportunity.

¶ 12    In October 2010, Lynne and the children moved from the marital home to a townhouse in Frankfort because Lynne was unable to refinance the home. Lynne pays $2,300 in rent for the townhouse. The townhouse is located outside the school district the children have attended since 2001. The children were able to attend school in their previous district during the 2010-11 school year, but they will be unable to do so in the future unless Lynne finds housing within the school district. Lynne has not been able to find suitable housing she can afford in the school district.

¶ 13    In March 2011, Lynne was offered another job in Austin, Texas. Her salary for that job

would be $3,000 per month, and she would still be able to perform consulting work for other clients. She estimated that her earning potential would be $6,000 gross income per month.

¶ 14 At the time of the hearing, Lynne was earning approximately $2,700 per month performing consulting work for various entities in Illinois. Lynne has investigated employment opportunities in Illinois but has not found any jobs comparable to the job offers she has received in Austin. The jobs in Austin give her greater opportunities to advance her career.

¶ 15 Lynne's mother, Nancy Perry, testified that she lives in Lexington, Texas, which is about one hour from Austin. Nancy's son, Rick, as well as his wife and two children, live three miles from her. She travels to Illinois to visit Lynne and her children two to four times a year. Lynne and her children come to Texas two to four times a year.

¶ 16 Brian testified that he is a musculoskeletal sonographer. He is self-employed by his own company, which has contracts with several imaging centers. Brian's parents live in Geneseo, Illinois, about 140 miles from him. Brian also has two uncles and three cousins in Illinois, who see his children once a year. Brian spends every other weekend with his children. He has never exercised his weekday parenting time or summer vacation time with them. He did not attend any of the children's extracurricular activities until after Lynne filed the petition for removal. Brian did not know the names of any of his children's teachers and has never attended a parent-teacher conference.

¶ 17 Brian testified that his children began seeing Jean Gray just before he and Lynne were divorced. He knew that the children continued to see Gray after the divorce but did not think they should. He did not believe that he should be required to pay the counseling bills from Gray because they are for "elective counseling" and are not a "health expense."

¶ 18 The trial court interviewed the children. At the time, C.K. was 13 years old. He was enthusiastic about moving to Austin and attending a new school. P.K., who was 15 years old, said that if she could not stay at her current high school in Illinois, she would rather be in school in Austin than any other school. Lynne presented many documents to the court, including evaluations of the children's current schools and the schools the children would attend in Austin.

¶ 19 Lynne proposed a visitation schedule that would allow Brian to see the children 2 to 11 days each month following their move to Texas, for a total of 46 days each year. In 2009, Brian saw the children 45 days. In 2010, Brian spent 43 days with the children.

¶ 20 Following the hearings, the trial court ruled on Lynne's motion and petitions. First, the trial court granted Lynne's petition for removal, finding that (1) the move would enhance the quality of Lynne's and the children's lives by increasing Lynne's income, providing her with more opportunities for career advancement, and guaranteeing her a family support network; (2) the educational opportunities in Austin are at least equal to and, in some categories, better than in Illinois; (3) Lynne's motives for the move are "pure and well intentioned"; (4) Brian's "motives for resisting are deeply steeped in obtaining a favorable financial settlement," rather than a concern that the move would interfere with his relationship with his children; and (5) the proposed visitation schedule will allow Brian to maintain his relationship with his children and even enhance it. The court concluded that "the overwhelming evidence [establishes] that it is in the children's best interest that the Petition to Remove be and is

hereby approved." The court ordered Lynne to pay travel costs of up to $8,352 per year to effectuate the new visitation schedule.

¶ 21    With respect to Lynne's petition for rule to show cause, the trial court ruled that Brian was obligated to pay half of the children's counseling bills. In doing so, the court ruled that "continuing the children with their regular counselor is not a major decision as contemplated by the Judgment."

¶ 22    Finally, the court granted Lynne's motion to modify support, finding a substantial change of circumstances as a result of Brian's increased income. The court found that Brian had an average gross income of $275,000, and that Lynne had reasonable expenses of approximately $12,000 per month. Taking into account Lynne's current income and her expected income in Austin, the court set unallocated support at $9,800 per month from August 1, 2009, to October 1, 2012.

¶ 23                                    I. Unallocated Support

¶ 24    Brian first argues that the trial court erred in increasing his unallocated support payments based on his gross income. He contends that the trial court was required to determine his net income before increasing his support payments, which consist of both child support and maintenance. Lynne responds that the trial court was not required to determine Brian's net income before increasing his unallocated support based on the language of the maintenance statute.

¶ 25    Unallocated support is considered maintenance for federal income tax purposes. *In re Marriage of Gleason*, 266 Ill. App. 3d 467, 468 (1994). In reality, however, unallocated support is child support and maintenance. *Id.*

¶ 26    Section 505 of the Illinois Marriage and Dissolution of Marriage Act (Act) addresses child support and requires the trial court to determine the payor's net income before making a child support award. See 750 ILCS 5/505(a)(1) (West 2008). As a prerequisite to determining a noncustodial parent's child support obligation, the trial court must first determine the parent's net income. *In re Marriage of Karonis*, 296 Ill. App. 3d 86, 92 (1998) (citing 750 ILCS 5/505(a)(1) (West 1998)). "Net income" is defined as the total of all income from all sources, minus certain deductions, including federal and state income tax, dependant and individual health/hospitalization insurance premiums, and expenditures for repayment of debts that represent reasonable and necessary expenses for the production of income. 750 ILCS 5/505(a)(3) (West 2010).

¶ 27    Section 504(a) of the Act lists relevant factors to consider in determining maintenance. 750 ILCS 5/504(a) (West 2010). One of those factors is "the income *** of each party." 750 ILCS 5/504(a)(1) (West 2010). The statute does not specify whether net income or gross income should be considered. Some courts have found that a payor's net income should be considered. See *In re Marriage of Orlando*, 218 Ill. App. 3d 312, 321-22 (1991) ("The paying spouse's net income is a factor to be considered in determining the amount of maintenance."); see also *In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1041-42 (2008) (court considered payor's net income); *In re Marriage of Reppen-Sonneson*, 299 Ill. App. 3d 691, 694 (1998) (same); *In re Marriage of Kristie*, 156 Ill. App. 3d 821, 823 (1987) (same).

Other courts have found that a payor's gross income must be considered. See *In re Marriage of Harlow*, 251 Ill. App. 3d 152, 162 (1993) (holding that trial court was required to consider payor's gross income before making a maintenance award); see also *In re Marriage of Abrell*, 386 Ill. App. 3d 718, 733 (2008) (court considered payor's gross income); *In re Marriage of Vernon*, 253 Ill. App. 3d 783, 786 (1993) (same); *In re Marriage of Greenberg*, 102 Ill. App. 3d 938, 946 (1981) (same).

¶ 28    We need not decide whether a trial court must consider a payor's gross income or net income when awarding maintenance because Brian was ordered to pay unallocated support, which is both child support and maintenance. See *Gleason*, 266 Ill. App. 3d at 468. While a court is not explicitly required to consider a payor's net income when making a maintenance award, a court is required to do so when making an award of child support. Compare 750 ILCS 5/504(a) (West 2010) ("income"), with 750 ILCS 5/505(a)(1) (West 2008) ("net income"). Since unallocated support is always comprised of some child support, we believe that a trial court must always determine the payor's net income, as that term is defined in section 505(a)(3) of the Act, before awarding unallocated support.

¶ 29    Here, the trial court increased Brian's unallocated support obligation based on his gross income. Since the trial court failed to consider Brian's net income, we reverse the court's order increasing Brian's unallocated support obligation and remand for the trial court to determine Brian's net income. The court may then order Brian to pay an unallocated support award based on that amount.

¶ 30                                    II. Counseling Bills

¶ 31    Brian next argues that the trial court erred in requiring him to pay half of the children's counseling bills from Jean Gray, pursuant to the marital settlement and joint parenting agreements.

¶ 32    Marital settlement agreements and joint parenting agreements are contracts. See *In re Marriage of Bohnsack*, 2012 IL App (2d) 110250, ¶ 9; *In re Marriage of Purcell*, 355 Ill. App. 3d 851, 856 (2005). Such agreements are governed by the same rules as those applying to the construction of contracts. *In re Marriage of Talmadge*, 179 Ill. App. 3d 806, 813 (1989). Clear and unambiguous agreements must be given their ordinary and natural meaning. *Id.* The intention of the parties is to be determined solely by reference to the agreement. *Id.*

¶ 33    Here, the marital settlement agreement provides that "All health expenses of the children *** that are not paid by insurance shall be paid equally by BRIAN and LYNNE." Additionally, the joint parenting agreement provides in pertinent part:

"The parties agree to discuss all health, education, and religious training issues, prior to any major decision being made. *** After discussion and failure of the parties to reach accord on a major decision, the party seriously objecting to the plan of the other party shall be responsible for instituting mediation, and, if necessary, thereafter and as a last resort, Court proceedings."

¶ 34    The undisputed evidence at the hearings established that the children began seeing Gray for counseling prior to Brian and Lynne's divorce. The children continued seeing Gray on a

-6-

regular basis after the divorce. The plain language of the joint parenting agreement requires Brian and Lynne to "discuss all health *** issues prior to any major decision being made." Here, Lynne and Brian made the decision to send their children to Gray to participate in counseling before the judgment for dissolution was entered. Because counseling was ongoing when the joint parenting agreement was signed, the children's continued participation in counseling was not "a major decision" that the parties had to discuss and agree on.

¶ 35 Furthermore, if, as Brian contends, he did not agree with the children continuing to attend counseling sessions after the divorce, he was required under the joint parenting agreement to institute mediation to resolve the issue. Brian was aware that the children continued to see Gray after the divorce and never instituted mediation to object to the continuing treatment.

¶ 36 Thus, we affirm the trial court's order requiring Brian to pay half of the counseling bills.

¶ 37                                             III. Removal

¶ 38 Finally, Brian argues that the trial court abused its discretion in granting Lynne's petition for removal to Austin because Lynne made little to no effort to seek employment in Illinois and his increased support payments would allow Lynne to afford housing in the children's original school district.

¶ 39 The paramount question presented by removal cases is whether the move is in the best interests of the children. *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988). Our supreme court has identified several factors that the circuit court should consider in assessing the children's best interests: (1) whether the move will enhance the quality of life for the custodial parent and for the children; (2) whether the custodial parent is motivated by a desire to hinder or defeat the noncustodial parent's visitation rights; (3) the noncustodial parent's motives for challenging removal; (4) the effect the move would have on the noncustodial parent's visitation rights; and (5) whether the move would allow for a reasonable and realistic visitation schedule for the noncustodial parent. *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 522-23 (2003).

¶ 40 A trial court's determination of what is in the best interests of the children should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. *Eckert*, 119 Ill. 2d at 328, 330. "The presumption in favor of the result reached by the trial court is always strong and compelling in this type of case." (Internal quotation marks omitted.) *Id.* at 330.

¶ 41 Here, the trial court heard testimony from the parties, Lynne's mother and the children. The court also received documentary evidence about the schools in Illinois and Texas. The court noted that Brian disputed much of Lynne's evidence and found "the facts as advanced by Mrs. Kincaid to be the most credible and reliable." The court analyzed each of the removal factors and determined that they supported removal.

¶ 42 With respect to the first factor, the court found that the move would likely enhance the general quality of life for both Lynne and the children. The court noted that the move would increase Lynne's income and provide her with greater opportunities to advance her career. The move would also provide both Lynne and the children a support network of extended family, which Lynne does not have in Illinois. The court noted that both children are

enthusiastic about attending school in Austin, where the educational opportunities are at least equal to the schools in Frankfort.

¶ 43    With respect to the second factor, the court stated that Lynne's motives for requesting the move are "pure and well intentioned." The court found "not a scintilla of evidence to suggest that interfering with the relationship between Dr. Kincaid and the children [is] a factor."

¶ 44    Regarding the third factor, the court found that Brian's motives for opposing the move "are deeply steeped in obtaining a favorable financial settlement, rather than his professed statement th[at] 'it will interfere with his relationship with his children.' The court believed that Brian's primary focus was his career, not his children, as evidenced by his failure to take advantage of his mid-week and summer visitation with the children.

¶ 45    With regard to the fourth and fifth factors, the court stated that it had "every reason to believe that the proposed visitation schedule will allow Dr. Kincaid to maintain his relationship with his children, and if he takes advantage of all of it, enhance it." The court noted that air travel between Austin and Chicago takes just over two hours and that the parties' income allows for frequent travel. The trial court also noted that daily contact could be arranged through Skype.

¶ 46    Our review of the record in this case reveals that the trial court's findings with respect to each factor are not against the manifest weight of the evidence. The move to Austin will certainly improve the quality of life of Lynne and the children by increasing Lynne's salary and her potential for career advancement and enabling Lynne and the children to be much closer to Lynne's extended family. See *In re Marriage of Guthrie*, 392 Ill. App. 3d 169, 173 (2009) (affirming removal where custodial parent had more employment opportunities in home state and her family would be able to provide support and assistance upon removal). While the move will not allow the children to continue biweekly visitation with their father, the visitation schedule proposed by Lynne is reasonable and realistic. It allows for monthly visitation and actually increases the number of days the children will spend with Brian. See *In re Marriage of Shelton*, 217 Ill. App. 3d 26, 36 (1991) (affirming removal where visitation would be somewhat increased). Additionally, as the court noted, the children can communicate with their father via Skype, ensuring that they maintain a close relationship with him. See *id.* (children could maintain a close relationship with father by talking to him on the phone).

¶ 47    Nevertheless, Brian contends that the trial court's order granting removal is against the manifest weight of the evidence because (1) Lynne failed to establish that she could not find a job in Illinois, and (2) the court failed to consider that his increased support payments would enable Lynne to afford housing in the children's school district. The evidence does not support either of these contentions.

¶ 48    First, Lynne testified that she searched for jobs in Illinois but was unable to find any that are comparable to the jobs she has been offered in Austin. She explained that the jobs she has been offered in Austin provide her with much greater opportunities for advancement than any job in Illinois. Better employment is a reasonable justification for removal. See *In re Marriage of Parr*, 345 Ill. App. 3d 371, 379 (2003).

¶ 49    Second, there is no evidence that supports Brian's assertion that Lynne would be able to

afford housing in the children's school district based on his increased support payments. The evidence at the hearing established that Lynne was making $2,700 per month from her work and had monthly expenses of $11,824, including rent for housing located outside of the children's school district. Her state and federal tax payments totaled $2,810 per month. Even with Brian's monthly support payments of $9,800, Lynne's monthly expenses will exceed her income after taxes. As a result, Lynne would not be able to afford more expensive housing in the children's school district despite the increase in support. Even assuming, *arguendo*, that Lynne could afford to stay in the children's school district, we would still find that the trial court's decision was not against the manifest weight of the evidence because, as explained by the trial court, all of the factors weigh in favor of removal.

¶ 50                               IV. Conclusion

¶ 51    For the reasons set forth above, we reverse and remand the trial court's order increasing Brian's unallocated support payments based on his gross income. We affirm the remaining orders of the trial court.

¶ 52    The judgment of the circuit court of Will County is affirmed in part and reversed and remanded in part.

¶ 53    Affirmed in part and reversed in part; cause remanded.